IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | : | NO. 2-12-CR-000417-1 |
| --- | --- | --- |
|  | : |  |
| vs. | : |  |
|  | : |  |
| TYSON WATSON | : |  |

GENE E.K. PRATTER                                                                                          APRIL 1, 2013

## MEMORANDUM

### INTRODUCTION

Tyson Watson is charged with being a felon in possession of a firearm (a violation of 18 U.S.C. § 922(g)(1)), and possessing cocaine base (a violation of 21 U.S.C. § 844). The charges stem from events that transpired in the early morning hours of April 6, 2012 at the Reflections Bar at 17th and Wingohocking Streets in Philadelphia. Mr. Watson challenges the conduct of the Philadelphia Police officers who arrived at the tavern and who ultimately seized the gun and narcotics from Mr. Watson, prompting the charges at issue. Following an evidentiary hearing on Mr. Watson's motion to suppress from the admissible evidence in this case the gun and cocaine, and having received the arguments of counsel, the Court denies the motion for the reasons discussed below.

1

**FACTUAL BACKGROUND**[1]

While on routine patrol at approximately 1:40 a.m. on April 6, 2012 Philadelphia Police Officers Jason Tomon and Geoffrey Strubinger responded to a radio call concerning an anonymous call-in report of a man flashing a gun inside the Reflections Bar, a site with which the officers were generally familiar as within their assigned patrol area and which they had entered on prior, unrelated occasions. The officers also received supplemental "flash" information that the person with the gun was a black male, wearing a gray Nike "hoodie" and blue jeans.

Within about two minutes of receiving the initial radio transmission, Officers Tomon and Strubinger arrived at the tavern. Another pair of Philadelphia police officers had arrived a moment earlier and were about to enter the bar. The four officers entered the establishment in which they saw about a dozen patrons. The interior of the Bar was neither brightly lighted nor darkened, but was reasonably well-lit. While the two first-to-arrive officers went to the back of the bar (described as a relatively narrow, converted row house with a long bar on one side and tables along the windowed opposite side), as did Officer Strubinger initially, Officer Tomon's attention was caught by a solitary individual standing at the bar about 5 to 6 feet from the entrance the officers had just used to come into the tavern.[2]

---

[1] This factual recitation is drawn from evidence presented at the suppression hearing conducted on February 20, 2013 at which Officers Jason Tomon and Geoffrey Strubinger testified, as did Richard Persico, a network support specialist working for the Office of Innovative Technology assigned to the Philadelphia Police Department. Certain additional background material is drawn from counsel's submissions as to which there appears to be no material dispute. Disputed facts are disclosed as such.

[2] Officer Strubinger briefly considered that a similarly attired individual in the bar at a high-top table along the wall opposite the bar about mid-way into the bar merited a closer look, but it quickly developed that this person did

Officer Tomon testified throughout the suppression hearing, both on thorough direct examination and under skilled and persistent cross-examination and again for re-direct and re-cross, that when he saw Mr. Watson at the bar he saw an individual who, on the surface, met the flash description - - a black male in a gray Nike hoodie wearing blue jeans - - and who, when approached by the officer and asked if he was "carrying", answered in the negative but seemed, to Officer Tomon, nervous and tense and avoided eye contact. Of particular note to Officer Tomon at the time was Mr. Watson's body language of shielding the right side of his body from the officer's view by pressing it against the bar, making the officer more suspicious of Mr. Watson than even the flash information match-up had prompted. Described as "blading", this one-side-of-body melding himself into the bar caused Officer Tomon to strongly suspect that Mr. Watson was hoping to shield some contraband from view - - in this case, a gun. Mr. Watson already had his hands on the bar, and Officer Tomon instructed him to keep them there while the officer took ahold of Mr. Watson's sweatshirt to secure him with one hand and quickly did a safety pat-down frisk with his other hand. In the process of this one-hand-on-the-hoodie and one-handed pat down Officer Tomon observed the bulge or sagging profile of a gun or gun-handle in the right hand pocket of Mr. Watson's hoodie. Officer Tomon promptly removed the gun from Mr. Watson and transferred it immediately to Officer Strubinger while keeping hold of Mr. Watson. Now under arrest, Mr. Watson was subjected to

---

not fit the flash description of the person the officers were seeking because this patron announced herself to be a woman and she was wearing a black (not gray) hoodie. Officer Strubinger's account of his brief conversation with this patron strikes the Court as somewhat imperfectly or awkwardly recalled because of the dubious likelihood that a woman alone in a neighborhood bar at close to closing time would, immediately before possibly being patted down by a police officer, say "…I'm not a male. I'm a female…" which is the quote Officer Strubinger repeatedly attributed to this person. In the final analysis, however, as the Court observed during the post-hearing oral argument, it is entirely plausible (as Government's counsel suggests) that the formality of the courtroom unconsciously stiffens the words used to recall a conversation without altering the true substance of it.

a more thorough search outside the Bar and prior to being transferred into the officers' car. During this search a packet of cocaine base was recovered from Mr. Watson's jeans' pocket.

To reiterate, Officer Tomon, based upon his experience and observations, had chosen to pursue the pat down of Mr. Watson, in the course of which he saw a gun handle protruding from the hoodie right side pocket. Officer Tomon removed the gun and transferred it to his partner, Officer Strubinger. The gun was a Lorcin .25 caliber semi-automatic with a partially obliterated serial number and six live rounds. At this point the officers placed Mr. Watson under arrest and took him outside the bar for a more thorough search during which a packet of "crack" cocaine was recovered from his jeans pocket. Mr. Watson was then put into the police car to be taken to the district station.

At no time before, during or subsequent to the officers' arrival at the Bar was anyone confirmed as the caller who initiated the 9-1-1 call about a man with a gun at the bar. Automated police paperwork, the so-called computer-assisted dispatch, or "CAD" report, presented at the suppression hearing does not reflect verification of a 9-1-1 call.

## **ANALYSIS**

Mr. Watson challenges the gun and drug evidence taken from him under the circumstances described above. His primary argument is that he questions whether any 9-1-1 call was ever made and, if none was made, then, Mr. Watson argues, the police had no basis to suspect Mr. Watson of anything and no reason to search him. Secondarily, Mr. Watson suggests that even if there had been an incoming call as claimed by the police, the "tip" was too

4

vague to be reliable enough for the officers to use for the purposes they pursued with Mr. Watson.

The Government responds to the suppression motion by describing the events of April 6, 2012 at the Reflections Bar as a run-of-the-mill, brief investigatory "Terry" stop permissible under Terry v. Ohio, 392 U.S. 1 (1968).  The Government rejects the defense claim that there was no 9-1-1 call and contends that under all the attendant circumstances the police had a sufficient basis to reasonably suspect that Mr. Watson was the person with the gun that was the subject of the 9-1-1 call and then acted reasonably to seize the gun and drugs from his person.  The Court agrees.

The fundamental defense claim that there was no 9-1-1 call, together with the follow-up claim of a conspiratorial police plan by Officers Tomon and Strubinger to roust the Reflections Bar patrons without reason, fails to persuade the Court.  First and foremost, if the defense theory that the officers testified untruthfully about having been told of a 9-1-1 call about a person with a gun at the Reflections Bar at just before 1:30 a.m. on April 6 was correct, and there really had been no such call, then one would have to question seriously how and why the other two officers who arrived at the Bar just before Officers Tomon and Strubinger knew to go to the Bar at all.  If there was indeed no radio alert to officers in the area about a person with a gun at the Bar, then the almost simultaneous arrival there by the other two officers would have to have been the result of an orchestration by the *four* officers in the *two* police cars, possibly, but not necessarily, with the participation of a radio dispatcher communicating a bogus alert

and, again possibly but not necessarily, the "flash" follow up.[3] There is no evidence of such closely coordinated orchestration. Moreover, the Court's assessment of Officer Tomon as he testified was that the officer comported himself in a credible, self-effacing manner to present a consistent recitation of the events in question and without doing so in an artificially or suspiciously rote or rehearsed way. Rather, as a sufficiently seasoned Officer Tomon spoke in a straight-forward manner, without exclusive or even primary resort to "magic words" or terms of law enforcement "art".[4]

According to the testimony and the application of common sense, Officer Tomon's decision to stop and frisk Mr. Watson before a more thorough investigation was not unreasonable under the totality of the circumstances extant. In addition to the factors enumerated by the government (Mr. Watson was a black man inside the bar, dressed in a gray hoodie displaying the distinctive Nike logo, wearing blue jeans, standing at the bar with a drink), when asked by the officer if he was "carrying", he undermined his negative response with relatively furtive body language and behavior. This prompted the officer's suspicions and concern in light of the officer's own experiences with human behavior as responses to his performance of police work. Case law abounds to authorize the follow-through performed by Officer Tomon here. See United States v. Arvizu, 534 U.S. 266, 273-77 (2002); e.g., United

---

[3] Further straining credulity, the wider conspiracy theory, if it included a phony "flash", would demand that the dispatcher somehow know the style, color and manufacturer of at least one Reflections Bar patron's wardrobe. This is so unlikely that the defense argument must be limited to the idea that only Officers Tomon and Strubinger concocted the 9-1-1 and "flash" predicates after they confronted Mr. Watson in the Bar. But this then leads back to the unanswered question of what would explain the other police officers' arrival at the Bar before theirs if not because of the avowed 9-1-1- call?

[4] His partner's use of more stilted language when recounting that the other patron stated "I'm not a male. I'm a female" just before possibly being frisked, does not alter the Court's conclusions for, in part, the reasons included in footnote 2, supra.

States v. Sokolaw, 490 U.S. 1, 8-9 (1989); United States v. Cortez, 449 U.S. 411, 417 (1981); United States v. Nelson, 284 F.3d 472, 474-475 (3d Cir. 2002); United States v. Tyson, 307 Fed. Appx. 664, 665-67 (3d Cir. 2009); United States v. Valentine, 232 F.3d 350, 356-57 (3d Cir. 2000).

Once engaged in a permissible search, Officer Tomon's discovery of first the gun partially observable in the pocket of the hoodie, and then the narcotics is likewise lawful. See, e.g., New York v. Class, 475 U.S. 106, 117 (1986); Coolidge v. New Hampshire, 403 U.S. 443, 465 n.24 (1971).

**CONCLUSION**

Accordingly, under Terry the initial detention of Mr. Watson was lawful and the subsequently seized evidence will not be suppressed from the evidence to be received in this case on the basis of the circumstances attendant to their seizure. An Order consistent with the Memorandum follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER,  J.
United States District Judge